**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **SANDRA JAEGER,**<br>Plaintiff,<br>vs.<br>**REGENERON PHARMACEUTICALS, INC.; and SANOFI-AVENTIS U.S. LLC,**<br>Defendants. | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br>**Civil Action No.: 5:26-cv-170** |

Plaintiff Sandra Jaeger, by and through the undersigned attorneys, and brings this action against REGENERON PHARMACEUTICALS, INC. and SANOFI-AVENTIS U.S. LLC (hereinafter, collectively, "Defendants"), for personal injuries suffered as a proximate result of injection of Defendants' prescription drug Dupixent® (dupilumab) (hereinafter "Dupixent" or "dupilumab"), and alleges as follows:

## INTRODUCTION

1. This is an action for damages relating to Defendants' wrongful conduct in connection with the development, testing, labeling, packaging, promoting, advertising, marketing, distribution, and selling of dupilumab as Defendants' brand prescription drug Dupixent® (hereinafter "Dupixent").

2. Defendants manufactured, promoted and sold Dupixent as a biologic medication for the treatment of multiple conditions, including atopic dermatitis

(AD), asthma, and other inflammatory diseases of the skin and respiratory tract in adult and pediatric patients. Dupixent is a biologic medication administered by subcutaneous injection with an initial dose administered at two different injection sites and subsequent doses administered every two to four weeks, depending on age and body weight.

3. Dupixent caused the development and/or aggravation of T-cell lymphoma in Sandra Jaeger. T-cell lymphoma is a rare type of cancer that affects white blood cells called T cells, or T lymphocytes. T-cells help the body's immune system fight germs. T-cell lymphomas are a subtype of non-Hodgkin lymphoma (NHL).

4. There are several types of T-cell lymphoma, including cutaneous T-cell lymphoma (CTCL) and peripheral T-cell lymphoma (PTCL). CTCL is a T-cell lymphoma that starts in the skin, whereas PTCL refers to systemic T-cell lymphomas that are found in the lymph nodes, other organs, the blood and some types also involve the skin. Mycosis fungoides and Sezary syndrome are the two most common subtypes of CTCL.

5. Defendants knew or should have known that Dupixent, when taken as prescribed and intended, causes and/or exacerbates T-cell lymphoma, including CTCL and PTCL.

6. Numerous case reports and scientific studies have established that Dupixent causes T-cell lymphoma, including CTCL and PTCL, and/or accelerates its progression.

7. Defendants failed to warn, instruct, advise, educate, or otherwise inform Dupixent users and prescribers, including Plaintiff and Plaintiff's treating physicians, about the risk of development and/or exacerbation of CTCL and PTCL. The U.S. label for Dupixent makes no mention of these risks.

8. As a proximate result of Defendants' wrongful actions and inactions, Plaintiff was injured and suffered serious personal injuries, including severe pain, loss of enjoyment of life, economic loss, out-of-pocket costs of medical tests and treatment from the use of Dupixent.

9. Plaintiff brings this action for personal injuries suffered as a proximate result of injection of Defendants' prescription drug Dupixent into Plaintiff. Plaintiff accordingly seeks compensatory damages, and all other available remedies provided to Plaintiff under the law due to the Defendants' negligent, reckless, and wrongful conduct.

## **THE PARTIES**

10. Plaintiff Sandra Jaeger brings this action on her own behalf. Plaintiff is a citizen of the State of Florida, and resides in Crystal River, Florida, which is located in Citrus County.

11. Plaintiff was injected with Defendants' Dupixent (dupilumab) product in February 2022. As a direct and proximate result of use of Defendants' Dupixent product, Plaintiff incurred medical expenses, and suffered severe pain and physical and emotional injuries, including development and/or acceleration and exacerbation of T-cell lymphoma, and loss of enjoyment of life.

12. Defendant REGENERON PHARMACEUTICALS, INC. (hereinafter, "Regeneron") is a corporation organized under New York law with its principal place of business located at 777 Old Saw Mill River Road, Tarrytown, NY 10591.

13. Defendant SANOFI-AVENTIS U.S. LLC (hereinafter "Sanofi-Aventis"), a wholly owned subsidiary of Sanofi, is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business at 55 Corporate Drive, Bridgewater, NJ 08807.

14. Regeneron submitted a Biologics License Application (BLA) for Dupixent (dupilumab) which was initially approved on March 28, 2017, for the indication of treatment of adult patients with moderate to severe atopic dermatitis whose disease is not adequately controlled with topical prescription therapies or when those therapies are not advisable (BLA 761055).

15. Regeneron subsequently submitted and obtained approval of multiple supplemental biologics license applications (sBLAs) to expand the indications for Dupixent to atopic dermatitis in pediatric patients; to asthma, chronic rhinosinusitis

with nasal polyps (CRSwNP), and eosinophilic esophagitis (EoE) in adult and pediatric patients; and to the treatment of prurigo nodularis (PN) and chronic obstructive pulmonary disease (COPD) in adult patients.

16. Defendants jointly developed, manufactured, marketed and distributed Dupixent throughout the nation including the state of Florida.

17. More than 800,000 people are being treated with Dupixent globally.[1]

18. Dupixent is a top-selling, blockbuster drug and a flagship product of both Sanofi-Aventis and Regeneron.[2] Sales of Dupixent were $14.1 billion in 2024 and at or above $4 billion per quarter for the first two quarters of 2025.[3]

19. Defendants manufactured, marketed, and distributed Dupixent injected into Plaintiff.

20. At all times relevant to this action, Defendants tested, studied, researched, designed, formulated, developed, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold Dupixent throughout the United States, including in and throughout the State of Florida, and generated substantial revenue as a result.

[1] https://www.accio.com/business/sanofi-top-selling-drugs; https://synapse.patsnap.com/article/what-are-the-top-selling-drugs-of-regeneron

[2] *Id*.

[3] https://firstwordpharma.com/story/5952354; https://finance.yahoo.com/news/dupixent-sales-spur-sanofi-growth-165640339.html; https://www.fiercepharma.com/pharma/sanofi-and-regenerons-dupixent-course-inflection-year-copd.

## JURISDICTION & VENUE

21. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00, and the Parties are citizens of different States.

22. Each Defendant regularly conducts business in Florida, including directly or indirectly marketing, promoting, distributing, and selling its products in Florida, including Dupixent.

23. Each Defendant purposefully availed itself of the privilege of conducting activities in Florida, such as marketing, promoting, distributing, and selling its products (including Dupixent) in Florida.

24. The harm suffered by Plaintiff in Florida arises from and/or is related to each Defendant's contacts with Florida, including marketing, promoting, distributing, and selling its products in Florida, including Dupixent, and other conduct purposefully directed at Florida.

25. Defendant Regeneron is registered to do business in Florida and established an agent to receive service of process in Florida and is therefore amenable to suit on any claim in Florida.

26. Defendants perform clinical trials in Florida.

27. Defendant Sanofi-Aventis does business related to consumer healthcare and medication in Florida through multiple business units, including, but not limited to, its wholly owned subsidiary Chattem, Inc.

28. Each Defendant's contacts with Florida were not random, isolated, or fortuitous.

29. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim, including the distribution, sale, and administration of Dupixent to Plaintiff and Plaintiff's development, diagnosis, and treatment of T-cell lymphoma, all occurred in the Middle District of Florida.

30. Defendant Regeneron Pharmaceuticals, Inc. is registered to do business in the State of Florida and can be served at its registered agent for service of process, CT Corporation System, at 1200 South Pine Island Road, Plantation, FL,33324.

31. Defendant Sanofi-Aventis U.S. LLC can be served at its registered agent for service of process, Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525.

## FACTUAL BACKGROUND

### A. Atopic Dermatitis

32. Dupixent was initially developed and approved to treat moderate to severe atopic dermatitis when topical treatments (treatments applied to the skin) are not sufficient or appropriate.

33. Atopic dermatitis, also known as atopic eczema, is a chronic inflammatory skin disease characterized by upregulation of the type 2 immune response and a dysfunctional skin barrier in which the skin is itchy, red and dry.

34. Atopic dermatitis may present with similar morphology (i.e., erythema, lichenification, fissuring with pruritus, disruption of the skin barrier, and impetiginization) as mycosis fungoides and Sezary syndrome, which are the two most common subtypes of CTCL.

### B. Dupixent

35. Dupixent (dupilumab) is a biologic medication – a human monoclonal antibody – that inhibits the signaling of interleukin-4 (IL-4) and interleukin-13 (IL-13) by specifically binding to the IL-4 receptor alpha subunit that is shared by the IL-4 and IL-13 complexes.[4]

[4] Sokumbi, et al., Evidence of dupilumab-associated cutaneous atypical lymphoid infiltrates. *Am J Dermatopathol*. 2021;43(10):714-20

36. Dupixent is indicated for the treatment of multiple conditions, including atopic dermatitis (AD), asthma, chronic rhinosinusitis with nasal polyps (CRSwNP), and eosinophilic esophagitis (EoE) in adult and pediatric patients and for the treatment of prurigo nodularis (PN) and chronic obstructive pulmonary disease (COPD) in adult patients.

37. Biologics are specialty medications made inside living cells and designed to target specific parts of the immune system involved in a particular disease.

38. Upon information and belief, at no time after receiving approval did Defendants take initiative to update their package insert or request permission from the FDA to warn about the development or exacerbation of T-cell lymphoma including CTCL and PTCL. Nor did Defendants use the “changes being effected” (“CBE”) labeling changes provision of 21 C.F.R. § 314.70(c)(6)(iii)(A), (C); 21 C.F.R § 314.3(b) to add or strengthen the warning and precautions or adverse reactions sections of the Dupixent label to alert patients and physicians of these increased dangers of Dupixent.

39. At all relevant times, there were safer and reasonably effective treatments and/or other FDA-approved medications for the treatment of atopic dermatitis which healthcare providers could have prescribed as an alternative treatment to Dupixent.

**C. Dangers of Dupixent: CTCL**

40. Shortly after Dupixent was released to the market, concerned clinical and academic physicians began publishing case reports linking dupilumab use with T-cell lymphoma, including CTCL (including mycosis fungoides and Sezary syndrome) and PTCL.[5] Following temporary, minimal or no benefit from Dupixent, doctors have observed, *inter alia*, worsening dermatitis, lymphadenopathy (swollen lymph nodes) and disease progression with rapid tumor growth.[6] Irreversible and aggressive cutaneous lymphoma disease acceleration in previously undiagnosed patients has also been reported.[7]

41. A recent retrospective cohort study from Memorial Sloan Kettering Cancer Center identified 30 patients with dupilumab exposure for atopic dermatitis

[5] *E.g.*, Tran, et al., Development of Sezary syndrome following the administration of dupilumab. *Dermatol Online J*. 2020; 26(4); Hollins, et al., Long-Standing dermatitis treated with dupilumab with subsequent progression to cutaneous T-cell lymphoma. *Cutis*. 2020; 106(2):E8-E11; Du-Thanh, et al., Lethal anaplastic large-cell lymphoma occurring in a patient treated with dupilumab. *JAAD Case Reports*. 2021; 18:4-7; Nakazaki, et al., Discordant lymphomas of classic Hodgkin lymphoma and peripheral T-cell lymphoma following dupilumab treatment for atopic dermatitis. *International Journal of Hematology*. 2022;116:446452; Choo, et al., Angioimmunoblastic T-cell lymphoma unmasked by treatment with dupilumab. *JAAD Case Reports*. 2023;33:87-90; Hamp, et. al., Dupilumab-Associated Sezary Syndrome, *Indian Journal of Dermatology*. 2023;68(4):459-462; Park, et al., Cutaneous T-cell lymphoma following dupilumab use: a systematic review. *International Journal of Dermatology*. 2023; 62:862-876 (collecting and analyzing case studies).

[6] *E.g.*, Espinosa, et al., Progression of cutaneous T-cell lymphoma after dupilumab: Case review of 7 patients. *J Am Acad Dermatol*. 2020; 83(1):197-199; Russomanno, et al., Acceleration of cutaneous T-cell lymphoma following dupilumab administration. *JAAD Case Reports*. 2021;8:83-85; Ahatov, et al., A rare case of aggressive cytotoxic T-cell lymphoma in a patient on dupilumab. *JAAD Case Reports*. 2022; 24:112-114

[7] *E.g.*, Jfri, et al. Diagnosis of mycosis fungoides or Sezary syndrome after dupilumab use: A systematic review. *J Am Acad Dermatol*. 2023; 88(5):1164-1166; Espinosa, et al., Progression of cutaneous T-cell lymphoma after dupilumab: Case review of 7 patients. *J Am Acad Dermatol*. 2020; 83(1):197-199.

or eczema followed by confirmed CTCL, but no patients with CTCL following other biologic treatments (JAKi and tralokinumab), which the authors noted "challenge[s] the hypothesis that severe chronic AD is the cause of CTCL in patients exposed to dupilumab."[8]

42. Several recent studies investigated the association between dupilumab and the exacerbation of pre-existing CTCL or its development by using a large database (TrinetX) to compare the incidence of CTCL in patients who have used dupilumab with those who have never used it. One study extracted data from 60 health care organizations that encompassed 22,888 atopic dermatitis patients who were prescribed dupilumab and over one million patients who did not use dupilumab. A second analysis was performed which excluded patients who had prior usage of a group of disease-modifying antirheumatic drugs which may confound the relationship between dupilumab and CTCL. The study found that patients with atopic dermatitis who were prescribed dupilumab had a four-fold higher risk of developing CTCL (OR 4.1003, 95% confidence interval 2.055-8.192), and a high increased risk remained statistically significant after exclusion of prior disease-modifying antirheumatic drug use (OR 3.202, 95% confidence interval 1.573-6.514).[9]

[8] Liao, et al., Diagnosis of cutaneous T-cell lymphoma following exposure to biologic agents for atopic dermatitis: A retrospective cohort study from a single tertiary cancer center. *J Am Acad Dermatol*. 2025;92(6):1394-1395.

[9] Hasan, et al., Dupilumab therapy for atopic dermatitis is associated with increased risk of cutaneous T cell lymphoma: A retrospective cohort study. *J Am Acad Dermatol*. 2024; 91(2):255-258.

43. A second study by a different group of scientists using the TriNetX database compared patients with atopic dermatitis who were treated with dupilumab with those who were treated with alternative therapies and found that patients treated with dupilumab had an almost fivefold statistically who never treated with dupilumab (RR = 4.59, 95% confidence interval 2.459-8.657, P < 0.0001).[10] These investigators found that the risk of developing CTCL is highest in the first year of therapy with dupilumab and in adult patients.[11]

44. The findings from the TriNetX studies "closely align" with a phase 3, 5-year open-label extension study evaluating the long-term safety of dupilumab that was sponsored by Defendants.[12] In that international, multicenter study, three out of 2677 adult patients developed CTCL (mycosis fungoides) and one patient developed T-cell lymphoma as a treatment emergent adverse event.[13]

45. Several published analyses of the FDA Adverse Event Reporting System (FAERS) database of dupilumab-related adverse events reported between

[10] Mandel, et al., Increased risk of cutaneous T-cell lymphoma development after dupilumab use for atopic dermatitis. *Dermatol Ther*. 2024:1-8.
[11] *Id.*
[12] Hasan, et al., Response to Flynn et al., "Dupilumab therapy for atopic dermatitis is associated with increased risk of cutaneous T cell lymphoma: A retrospective cohort study." *J Am Acad Dermatol*. 2025; e7-e8.
[13] Beck, at al., Dupilumab in adults with moderate to severe atopic dermatitis: a 5-year open-label extension study. *JAMA Dermatol*. 2024; 160:805-812; https://clinicaltrials.gov/study/NCT01949311. In addition, two patients developed Hodgkin's disease and one patient developed Hodgkin's disease lymphocyte predominance type state III. https://clinicaltrials.gov/study/NCT01949311.

2017 and 2023 found a strong safety signal for CTCL with dupilumab.[14] "Compared to other therapies used in AD [atopic dermatitis], dupilumab had the most case reports and the highest RORs [reporting odds ratio] for CTCL."[15]

46. Analysis of the World Health Organization global database of individual case safety reports (VigiBase) found an eleven-fold statistically significant odds ratio of 11.11 (95% confidence interval 6.77-18.23) of CTCL with dupilumab use.[16]

47. Physicians who treat patients who have developed CTCL after use of Dupixent have presented their results at national and international conferences, which upon information and belief, have been attended by employees of Defendants.

48. Physicians who have prescribed Dupixent to patients who then were diagnosed with CTCL after use of Dupixent have reported their concern to sales representatives of Defendants.

[14] Cabrera-Perez, et al., Integrative epidemiology and immunotranscriptomics uncover a risk and potential mechanism for cutaneous lymphoma unmasking or progression with dupilumab therapy. *J. Allergy Clin Immunol*. 2025; 155(5):1584-1594; Lavin, et al., Cutaneous T-cell lymphoma after dupilumab use: a real-world pharmacovigilance study of the FDA Adverse Event Reporting System, *Journal of Investigative Dermatology*. 2025; 145:211-214.

[15] Cabrera-Perez, et al., Integrative epidemiology and immunotranscriptomics uncover a risk and potential mechanism for cutaneous lymphoma unmasking or progression with dupilumab therapy. *J. Allergy Clin Immunol*. 2025; 155(5):1584-1594, at 1592.

[16] Mota, et al, Real-world evidence on the risk of cancer with anti-IL-5 and anti-IL-4Ra biologicals. *Allergy*.2022:1375-1377.

49. The causal link between dupilumab and CTCL and PTCL has been found to be biologically plausible. Specifically, dupilumab may cause initiation and/or progression of CTCL and PTCL via the same mechanism through which it improves atopic dermatitis: the IL-13 receptor blockade which leads to increased IL-13 in the local milieu, driving CTCL and PTCL stimulation and progression.[17] Dupilumab may also disrupt the equilibrium phase maintained by IL-4 leading to the progression of CTCL by triggering an "escape phase" of tumor cells.[18]

50. Upon information and belief, Defendants have not informed the FDA of all of the newly acquired, mounting evidence that use of Dupixent results in the development and/or exacerbation of T-cell lymphoma, including CTCL and PTCL.

51. Upon information and belief, at no time did Defendants request permission from the FDA to warn physicians and patients about the newly acquired information related to the development or acceleration of T-cell lymphoma, CTCL and/or PTCL with Dupixent use, nor did Defendants use the CBE labeling changes provision to alert physicians and patients of same.

[17] Cabrera-Perez, et al., Integrative epidemiology and immunotranscriptomics uncover a risk and potential mechanism for cutaneous lymphoma unmasking or progression with dupilumab therapy. *J. Allergy Clin Immunol*. 2025; 155(5):1584-1594, at 1584, 1589-93; Hollins, et al., Long-Standing dermatitis treated with dupilumab with subsequent progression to cutaneous T-cell lymphoma. *Cutis*. 2020; 106(2):E8-E11; Nakazaki, et al., Discordant lymphomas of classic Hodgkin lymphoma and peripheral T-cell lymphoma following dupilumab treatment for atopic dermatitis. *International Journal of Hematology*. 2022;116:446452

[18] Guglielmo, et al., Mycosis fungoides and IL-4/13 inhibitors: what is known and unmet needs. *Expert Review of Clinical Immunology*. 2025; 21(6):723-729.

**D. Defendants' Failure to Test Dupixent**

52. Defendants knew or should have known of the potential of Dupixent to exacerbate or accelerate pre-existing T-cell lymphoma, including CTCL and PTCL, or increase susceptibility to its development.

53. Despite the fact that peer-reviewed case reports, case series, epidemiologic articles and studies emerged providing evidence of the carcinogenic dangers of Dupixent,[19] Defendants failed to adequately test Dupixent to investigate the risks, including the potential of exacerbating pre-existing T-cell lymphoma or increasing susceptibility to its development.

**E. Defendants' Failure to Warn**

54. Despite multiple peer-reviewed publications and Defendants' knowledge of adverse events, Defendants continued to manufacture, promote, advertise, market and distribute Dupixent without alerting prescribers or patients in labeling, marketing materials, product inserts or otherwise of the increased risks of serious injury, including development or accelerated progression of CTCL and PTCL, from use of Dupixent.

[19] *E.g.*, Hollins, et al., Long-Standing dermatitis treated with dupilumab with subsequent progression to cutaneous T-cell lymphoma. *Cutis*. 2020; 106(2):E8-E11.

55. Defendants failed to warn physicians and patients that Dupixent should not be prescribed or administered to patients with confirmed or suspected T-cell lymphoma, including CTCL and PTCL, and that these diagnoses should be ruled out, by skin biopsy, testing for T-cell receptor gene arrangement, flow cytometry of the blood, or otherwise, prior to Dupixent administration, especially with atypical presentations such as adult-onset atopic dermatitis, patients without personal or familial atopic medical history, and/or erythrodermic and other uncharacteristic presentations like plaques, nodules or sparing flexural sites.[20]

56. Defendants failed to warn physicians and patients that due to the risk of development and exacerbation of T-cell lymphoma with dupilumab, careful clinical, histopathologic and immunohistochemical evaluation should be performed before and during treatment with dupilumab.[21] Early detection of CTCL and PTCL is of critical importance because a delay in diagnosis contributes to disease progression and high risk of mortality.[22]

[20] *See* Mandel, et al., Increased risk of cutaneous T-cell lymphoma development after dupilumab use for atopic dermatitis. *Dermatol Ther*. 2024:1-8; Guitart J, Dupilumab, Atopic Dermatitis, and Mycosis Fungoides-New Insights on an Evolving Story, *JAMA Dermatology*. 2023; 159(11):1177-1178; Guglielmo, et al., Mycosis fungoides and IL-4/13 inhibitors: what is known and unmet needs. *Expert Review of Clinical Immunology*. 2025; 21(6):723-729.

[21] *See* Sokumbi, et al., Evidence of dupilumab-associated cutaneous atypical lymphoid infiltrates. *Am J Dermatopathol*. 2021;43(10):714-20.

[22] Park, et al., Cutaneous T-cell lymphoma following dupilumab use: a systematic review. *International Journal of Dermatology*. 2023; 62:862-876.

57. Defendants failed to warn physicians and patients that use of Dupixent in patients with adult-onset atopic dermatitis and no history of atopy may result in development and/or acceleration of CTCL and PTCL.[23] Defendants failed to warn that these patients should be closely monitored and that a biopsy of skin lesions should be performed when clinical improvement is minimal or absent.[24]

58. Defendants failed to warn physicians and patients to diligently monitor disease course via close clinical follow-up after Dupixent initiation for both dupilumab responders and nonresponders.[25] Treaters and patients should have been warned to be on the lookout for inadequate treatment response (including following initial improvement) and/or signs and symptoms of CTCL and PTCL and to promptly evaluate for T-cell lymphoma following detection of same. Defendants should have warned that signs and symptoms that merit prompt evaluation for T-cell lymphoma in patients on Dupixent with presumed atopic dermatitis include new eczematous plaques in locations different than original sites, worsening

[23] *See* Hollins, et al., Long-Standing dermatitis treated with dupilumab with subsequent progression to cutaneous T-cell lymphoma. *Cutis*. 2020; 106(2):E8-E11.

[24] Li., et al., Dupilumab-associated lymphoproliferative disorders: a comprehensive review on clinicohistopathologic features and underlying mechanisms. *Current Opinion in Immunology*. 2025: 94:102563.

[25] Park, et al., Cutaneous T-cell lymphoma following dupilumab use: a systematic review. *International Journal of Dermatology*. 2023; 62:862-876; Mandel, et al., Increased risk of cutaneous T-cell lymphoma development after dupilumab use for atopic dermatitis. *Dermatol Ther*. 2024:1-8; Jfri, et al. Diagnosis of mycosis fungoides or Sezary syndrome after dupilumab use: A systematic review. *J Am Acad Dermatol*. 2023; 88(5):1164-1166.

pruritus (itching), lymphadenopathy, and new-onset moderate to severe "atopic dermatitis" in the elderly.[26]

59. Defendants have heavily marketed Dupixent in television advertisements, social media, the internet, and print brochures as providing clearer skin, fast itch relief, and better breathing. For patients with eczema, Defendants claim that Dupixent "help[s] heal your skin from within"[27] and "helps you feel the heal and see the difference with less itch and clearer skin."[28] They encouraged patients to "show off your skin."[29] For patients with asthma, Defendants claim that Dupixent "helps people with asthma breathe easier" and will allow them to "get more out of [their] lungs," to "Du [sic] more with less asthma" and "achieve better breathing that lasts."[30] Defendants promote Dupixent as providing "Benefits with every breath."[31] For patients with COPD, Defendants claim that Dupixent is "proven to help reduce

[26] Espinosa, et al., Progression of cutaneous T-cell lymphoma after dupilumab: Case review of 7 patients. *J Am Acad Dermatol*. 2020; 83(1):197-199.

[27] Dupixent Patient Brochure, 2023, Sanofi and Regeneron Pharmaceuticals, Inc., "Stay ahead of eczema with Dupixent"; Dupixent "No Matter What" TV spot, https://www.andrewjeske.com/dupixent; Dupixent "Stay Ahead" TV spot, https://www.ispot.tv/ad/50Bs/dupixent-stay-ahead; Dupixent "Show Off: Pool and Party" TV spot, https://www.ispot.tv/ad/6Jz9/dupixent-show-off-pool-and-party; Dupixent "One Step Ahead" TV spot, https://www.ispot.tv/ad/OGzj/dupixent-one-step-ahead.

[28] *E.g.*, Dupixent Patient Brochure, 2025, Sanofi and Regeneron Pharmaceuticals, Inc., "Dupixent helps you feel the heal and see the difference." *See also* https://www.dupixent.com/atopicdermatitis/.

[29] *E.g.*, Dupixent "Show Off: Pool and Party" TV spot, https://www.ispot.tv/ad/6Jz9/dupixent-show-off-pool-and-party.

[30] Dupixent TV Spot, "Better Days", https://www.ispot.tv/ad/BTY3/dupixent-asthma-better-days; Dupixent TV Spot, "This is Better: Roller Disco", https://www.ispot.tv/ad/TRbU/dupixent-this-is-better-roller-disco. *See also* https://www.dupixent.com/asthma/.

[31] https://www.dupixent.com/asthma/.

flareups so you can do more with less COPD" and that it "helps adults breathe easier starting in as little as two weeks. That could mean more places visited, more dogs walked, more gardens tended, more to look forward to. It's amazing what can happen when you can do more."[32]

60. In their 2024 "Welcome to Dupixent" guide, Defendants claim that "Dupixent acts like a firefighter – it aims to dampen down the fire. It can do this by calming certain immune cells down and making them less active than before."

61. Defendants made repeated representations that Dupixent is safe and effective, including references to "safety results" from clinical trials.[33] Defendants made these false and misleading statements even though they knew Dupixent had lymphoproliferative disorder risks that had not been adequately studied with respect to its effect on the development or progression of T-cell lymphoma, including CTCL and PTCL.

62. According to the Drugs@FDA website, the label for Dupixent has been updated thirty-two times, but Defendants' U.S. labels have not contained any warning or any information whatsoever on the propensity of Dupixent to cause the development or exacerbation of T-cell lymphoma including CTCL and PTCL.

[32] Dupixent TV Spot, "More", https://www.ispot.tv/ad/Tj_6/dupixent-more. *See also* https://www.dupixent.com/copd/.

[33] *E.g.*, Dupixent Patient Brochure, 2025, Sanofi and Regeneron Pharmaceuticals, Inc., "Dupixent helps you feel the heal and see the difference."

63. Defendants should have warned patients and prescribers, including Plaintiff and Plaintiff's treating physicians, that Dupixent may result in the development or exacerbation of T-cell lymphoma, which can lead to accelerated disease progression. Defendants were on notice of these risks from the peer-reviewed literature, reports of adverse events, presentations at professional conferences, and their own studies.

64. Defendants could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Dupixent's label without any prior FDA approval.

**PLAINTIFF'S SPECIFIC FACTS**

65. Plaintiff Sandra Jaeger lives in Crystal River, Florida.

66. Plaintiff received treatment for severe skin rashes beginning in or around 2017. Diagnosed and treated as intrinsic atopic dermatitis and seborrheic dermatitis. Previous treatments included multiple topical and oral medications, such as, cyclosporine, clobetasol, doxycycline, and mometasone.

67. Plaintiff was prescribed Dupixent for treatment of intrinsic atopic dermatitis in or around February 2022.

68. Plaintiff was injected with Dupixent in February 2022 every 14 days through July 2022.

69. At all relevant times, Defendants represented Dupixent to be appropriate, safe, and suitable for such purposes.

70. Plaintiff had not been diagnosed with lymphoma of any kind (including CTCL and PTCL) prior to initiation of Dupixent.

71. Plaintiff's previous biopsies resulted in spongiotic dermatitis with eosinophils until after Dupixent injections. Plaintiff was hospitalized due to enlarged axillary and inguinal lymph nodes and elevated white blood cell count on March 14, 2022. During her admission she underwent cytogenetic testing which resulted as lymphoma.

72. Plaintiff underwent a left axillary lymph node biopsy on April 1, 2022. Initial results from biopsy on April 4, 2022, indicated T-cell neoplasm. The final pathology report was signed on April 6, 2022, confirming T-cell lymphoma. On April 26, 2022, a pathology report addendum was issued after additional FISH analysis on the lymph node specimen resulted supporting the diagnosis of T-cell lymphoma.

73. Plaintiff was seen by dermatology on June 15, 2022, at which time a punch biopsy of the left palm was consistent with CTCL (cutaneous T-cell lymphoma). Plaintiff was later admitted on July 1, 2022, with pain and discoloration of her palms and feet.

74. In or around February 2025, Plaintiff became concerned again for enlarged lymph nodes in her axillary and inguinal regions. On February 3, 2025,

Plaintiff underwent an additional left inguinal lymph node biopsy, which resulted in anaplastic large cell lymphoma.

75. Defendants failed to timely and adequately warn Plaintiff and her medical providers of the propensity of Dupixent to cause the development or accelerate the progression of T-cell lymphoma, despite Defendants' knowledge of same.

76. Defendants' Dupixent was at all times utilized and prescribed in a manner foreseeable to Defendants.

77. Plaintiff and Plaintiff's physicians used Dupixent in the manner in which it was intended and recommended to be used and did not misuse or alter Dupixent in an unforeseeable manner, making such use reasonably foreseeable to Defendants.

78. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and Plaintiff's physicians the true and significant risks associated with Dupixent injections.

79. As a result of Defendants' actions, Plaintiff and Plaintiff's physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

80. As a direct and proximate result of the Defendants' wrongful actions and inactions, Plaintiff sustained severe physical and emotional injuries, including loss of capacity for enjoyment of life, aggravation and exacerbation of preexisting conditions, mental and physical pain and suffering, cost of medical and hospital and other care and treatment.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN

81. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleges as follows.

82. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Dupixent and placed Dupixent into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

83. Defendants, as manufacturers, distributers, and marketers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Dupixent were inadequate.

84. Plaintiff and Plaintiff's treating and prescribing physicians did not have the same knowledge as Defendants and no adequate warning was communicated to Plaintiff or to her physicians.

85. Defendants had a duty to provide adequate warnings and instructions for Dupixent and to adequately understand, test, and monitor their product.

86. Defendants had a duty to distribute, market, and/or sell Dupixent with adequate warnings that did not present an unreasonable risk of harm or injury to users who took the drug, including Plaintiff.

87. Defendants had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Dupixent, as it became or could have become available to Defendants.

88. The warnings that accompanied Dupixent and the corresponding Label, Full Prescribing Information, Instructions for Use, and Patient Information were defective, thereby making the product not reasonably safe for its expected, intended, and/or foreseeable uses, functions and purposes.

89. Dupixent and its corresponding Label, Full Prescribing Information, Instructions for Use, and Patient Information were not reasonably safe as distributed, marketed, delivered and/or sold by Defendants.

90. Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Dupixent, to health care providers empowered to prescribe and dispense Dupixent, and to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omissions and affirmative misstatements in its labeling, full prescribing information, instructions for use, patient information, brochures, marketing and promotional materials, and advertisements, Defendants misled users and the medical community about the risk and benefit balance of Dupixent, which resulted in injury to Plaintiff.

91. Defendants knew or should have known through testing, scientific knowledge, advances in the field, published research in peer-reviewed journals, or otherwise, that Dupixent created a risk of serious injury, including the development or exacerbation of CTCL and PTCL, which can lead to accelerated disease progression.

92. Despite the fact that Defendants knew or should have known that Dupixent caused unreasonable and dangerous serious injuries, they continued to promote and market Dupixent without providing adequate clinically relevant information and data.

93. Defendants knew or should have known that consumers, including Plaintiff, would foreseeably and needlessly suffer injury as a result of Defendants' failures.

94. The Dupixent supplied to Plaintiff by Defendants was defective, unreasonably dangerous, and had inadequate warnings and instructions at the time it was sold, and Defendants also acquired additional knowledge and information confirming the defective and unreasonably dangerous nature of Dupixent. Despite this knowledge and information, Defendants failed and neglected to issue adequate warnings that Dupixent causes serious injury including the development or exacerbation of CTCL, which can lead to accelerated disease progression.

95. Defendants' failure to provide adequate warnings and instructions rendered Dupixent unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendants, and in that the risk of danger outweighs the benefits in certain patient populations.

96. Defendants failed to provide timely and adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's treating physicians.

97. Plaintiff's prescribing physicians, nurse practitioners, and physician assistants (hereinafter collectively referred to as "Plaintiff's Prescribing Healthcare

Providers") would not have prescribed Dupixent to Plaintiff or would have ceased injecting it had they been apprised by Defendants of the increased risk of development or acceleration of CTCL and PTCL in patients similar to Plaintiff, including those who have been diagnosed with adult-onset atopic dermatitis and have erythrodermic presentation.

98. Upon information and belief, had they been provided with adequate warnings and instructions by Defendants, Plaintiff's Prescribing Healthcare Providers would have administered appropriate testing to rule out CTCL and PTCL prior to prescribing Dupixent to Plaintiff.

99. Upon information and belief, had they been provided adequate warnings and instructions by Defendants, Plaintiff's Prescribing Healthcare Providers would have performed a biopsy when her clinical improvement with Dupixent was minimal, which would have resulted in earlier detection of Plaintiff's T-cell lymphoma and allowed time for treatment to occur.

100. Alternatively, even if Defendants had apprised Plaintiff's Prescribing Healthcare Providers of the increased risk of development or exacerbation of CTCL and PTCL in individuals with Plaintiff's presentation with usage of Dupixent and these Prescribing Healthcare Providers had still recommended usage of Dupixent to Plaintiff, the Prescribing Healthcare Providers would have relayed the information concerning the increased risk to Plaintiff, and Plaintiff as an objectively prudent

person would not have chosen to inject Dupixent, notwithstanding Plaintiff's Prescribing Healthcare Providers' recommendation.

101. Similarly, if Defendants had warned of the increased risk of development or exacerbation of CTCL and PTCL associated with the usage of Dupixent in individuals with Plaintiff's presentation in the Patient Information handout, brochures, marketing and promotional materials and advertisements directed to users like Plaintiff, Plaintiff as an objectively prudent person would not have chosen to take Dupixent, notwithstanding Plaintiff s Prescribing Healthcare Providers' recommendation.

102. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's Prescribing Healthcare Providers to the dangerous risks of Dupixent including, among other things, increased risk of the development or exacerbation of CTCL and PTCL, which can lead to accelerated disease progression, and the need to diligently monitor disease course via close clinical follow-up after Dupixent initiation.

103. Defendants failed to provide adequate post-marketing warnings and instructions after Defendants knew or should have known of the significant risks of, among other things, the development or exacerbation of CTCL and PTCL, which can lead to accelerated disease progression.

104. Defendants continued to aggressively promote and sell Dupixent without adequate warnings, even after they knew or should have known of the unreasonable risks of serious injury including the development or exacerbation of CTCL and PTCL, which can lead to accelerated disease progression from the drug.

105. Defendants had an obligation to provide Plaintiff and Plaintiff's Prescribing Healthcare Providers with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Dupixent, and/or that there existed safer and more or equally effective alternative drug products, and/or that diligent monitoring of disease course via close clinical follow-up after Dupixent initiation was necessary.

106. By failing to adequately test and research harms associated with Dupixent, and by failing to provide appropriate warnings and instructions about Dupixent use, patients and the medical community, including Plaintiff's Prescribing Healthcare Providers, were inadequately informed about the true risk-benefit profile of Dupixent and were not sufficiently aware that serious injury might be associated with use of Dupixent.

107. The Dupixent designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendants knew or should have known of the risks of severe injury from Dupixent,

Defendants failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote Dupixent.

108. Dupixent is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendants had exercised all possible care in its preparation and sale.

109. The inadequate warnings for Dupixent existed when the drug left the Defendants' control.

110. The Dupixent tested, studied, researched, designed, formulated, manufactured, inspected, labeled, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

111. The foreseeable risk of serious injury caused by Dupixent could have been reduced or avoided by Plaintiff and/or Plaintiff's prescribers had Defendants provided reasonable instructions or warnings of these foreseeable risks of harm.

112. Plaintiff could not, by the exercise of reasonable care, have discovered Dupixent's defects or perceived its dangers or avoided injury.

113. Inadequate warnings, labeling, and instructions accompanying Dupixent received by Plaintiff and Plaintiff's prescribing physicians were a substantial factor in causing Plaintiff's injuries.

114. The Defendants are strictly liable for providing inadequate warnings accompanying Dupixent; for the distribution, marketing, and/or sale of Dupixent; and for the injuries sustained by Plaintiff.

115. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Dupixent, Plaintiff sustained serious bodily injury, severe pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, medical expenses and other economic losses, aggravation of previously existing conditions.

116. Defendants consciously disregarded the increased risks of harm by failing to adequately warn of such risks; unlawfully concealing the dangers associated with Dupixent; and continuing to market, promote, sell, and defend Dupixent.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE**

117. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleges as follows.

118. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Dupixent for use by consumers, such as Plaintiff.

119. At all times relevant to this action, Defendants had a duty to exercise reasonable care in testing, study, research, formulation, manufacture, inspection, labeling, promotion, advertisement, marketing, distribution, and sale of Dupixent for use by consumers, such as Plaintiff.

120. Prior to and during the time frame of Plaintiff's use of Dupixent, Defendants breached this duty, failed to exercise reasonable care, and were grossly negligent and careless in the testing, study, research, manufacture, inspection, labeling, promotion, advertisement, marketing, distribution, and sale of Dupixent.

121. At all times material hereto, the Defendants had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers associated with Dupixent.

122. Defendants had access to clinical trial and registry data and were aware of complaints that Dupixent caused serious complications including but not limited to the development or acceleration of CTCL and PTCL.

123. Despite the fact that Defendants knew or should have known that Dupixent posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the drug without revising any warning language.

124. Defendants failed to exercise due care under the circumstances, and their gross negligence and recklessness includes the following acts and omissions:

a. Negligently failing to properly and adequately test Dupixent before releasing the drug to market;

b. Negligently failing to conduct sufficient post-market testing and surveillance of the drug;

c. Negligently manufacturing, marketing, advertising, distributing and selling the drug;

d. Continuing to negligently manufacture and distribute the drug without adequate warnings and instructions after the Defendants knew or should have known of Dupixent's adverse effects;

e. Negligently manufacturing, marketing, advertising, distributing, and selling the drug to consumers, including Plaintiff, without an adequate warning of the dangerous risks of the drug;

f. Negligently failing to notify and warn the public, including Plaintiff, and physicians of reported incidents involving injury and the negative health effects attendant to the use of the drug;

g. Negligently failing to conduct sufficient clinical analysis of Dupixent, which if properly performed would have shown that Dupixent had serious side effects, including but not limited to the increased risks of the development or acceleration of CTCL and PTCL;

h. Negligently failing to conduct adequate pharmacovigilance and prepare a pharmacovigilance assessment and plan to mitigate the risks of the development or exacerbation of CTCL and PTCL;

i. Negligently misrepresenting the safety of Dupixent;

j. Negligently failing to provide warnings, instructions or other information that accurately reflected the risks of Dupixent;

k. Negligently failing to exercise due care in the advertisement and promotion of Dupixent;

l. Negligently disseminating information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the serious risks of Dupixent;

m. Negligently failing to adequately warn Plaintiff's prescribing physicians regarding the increased risks of the development or acceleration of CTCL and PTCL through various communication vehicles, including Dupixent's labeling, patient medication guides, Dear Healthcare Provider letters, press releases, and other risk communication options;

n. Aggressively promoting Dupixent without adequate warnings and instructions even after Defendants knew or should have known of the unreasonable risks from the drug;

o. Negligently diminishing or hiding the risks associated with Dupixent; and

p. Negligently violating applicable state and federal laws and regulations.

125. A reasonable manufacturer, distributor, promoter, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

126. Plaintiff and Plaintiff's prescribing physicians reasonably relied upon the skill, superior knowledge, and judgment of Defendants. Defendants had a continuing duty to warn Plaintiff and her prescribing physicians of the dangers associated with Dupixent. Had Plaintiff and her physicians received adequate warnings regarding the risks of Dupixent, Plaintiff would not have been prescribed and used the product.

127. Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the testing, inspection, labeling, supplying, marketing, selling, advertising, and warning of the risks and dangers of Dupixent, and otherwise distributing the drug.

128. As a direct and proximate result of one or more of the above-stated acts, omissions, and conduct committed by the Defendants, Plaintiff sustained

serious bodily injury, severe pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, medical expenses and other economic losses, aggravation of previously existing conditions.

**<u>THIRD CAUSE OF ACTION</u>**
**<u>NEGLIGENCT MISREPRESENTATION</u>**

129. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

130. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Dupixent for use by consumers, such as Plaintiff.

131. Defendants owed a duty to prescribing physicians, other healthcare providers and to consumers of Dupixent, including Plaintiff, to accurately and truthfully represent the risks of the drug. Defendants breached their duty by misrepresenting the safety and known risks of Dupixent and/or by failing to adequately warn Plaintiff's prescribing physicians, the medical community, Plaintiff, and the public about the risks of Dupixent, including that use of Dupixent results in increased risk of the development or exacerbation of CTCL and PTCL in individuals with presentations similar to Plaintiff, which Defendants knew or in the exercise of diligence should have known.

132. The Defendants, as the designers, manufacturers, sellers, promoters, and/or distributors of Dupixent knew, or reasonably should have known, that health care professionals and consumers of Dupixent would rely on information

disseminated and marketed to them regarding the product when weighing the potential benefits and potential risks of prescribing and using the drug.

133. The Defendants, as the designers, manufacturers, sellers, promoters, and/or distributors of Dupixent knew, or reasonably should have known, that patients using Dupixent would suffer from the development or exacerbation of T-cell lymphoma including CTCL and PTCL because the information disseminated by Defendants and relied upon by health care professionals and consumers, including Plaintiff and Plaintiff's Prescribing Healthcare Providers, was materially inaccurate, misleading, or otherwise false.

134. The Defendants failed to exercise reasonable care to ensure that the information they disseminated to health care professionals and consumers concerning the risks of Dupixent was accurate, complete, and not misleading. As a result, Defendants disseminated information to health care professionals and consumers, including via advertising campaigns, labeling materials, print advertisements, social media and commercial media, that was materially inaccurate, misleading, false, and unreasonably dangerous to consumers such as Plaintiff.

135. Among Defendants' numerous misrepresentations and misleading omissions were Defendants' assurances that Dupixent was safe and effective, that it would "heal your skin from within," that it would allow patients to "du [sic] more," and that it would provide "benefits with every breath."

136. Despite their knowledge of serious problems with Dupixent, Defendants continued to market Dupixent, present at conferences, and distribute medical literature, studies, and other communications to the medical community in an effort

to mislead them and the general public about the risks associated with Dupixent and instead create the image and impression that Dupixent was safe for all patients.

137. Defendants made such statements even after they became aware of serious complications with Dupixent. Defendants did not reveal (and instead concealed) their knowledge of serious complications and other bad data.

138. Defendants made these representations with the intent to induce reliance thereon, and to encourage prescribing and using Dupixent.

139. Defendants knew or should have known that Plaintiff, Plaintiff's Prescribing Healthcare Providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendants.

140. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's Prescribing Healthcare Providers were induced to, and did, prescribe and use Dupixent, thereby causing Plaintiff to suffer severe personal injuries.

141. Plaintiff and Plaintiff's Prescribing Healthcare Providers would not have used or prescribed Dupixent had the true facts not been concealed by the Defendants.

142. Defendants had sole access to many of the material facts concerning the defective nature of Dupixent and its propensity to cause serious and dangerous side effects.

143. At the time Plaintiff was prescribed and took Dupixent, Plaintiff and Plaintiff's Prescribing Healthcare Providers were unaware of Defendants' negligent misrepresentations and omissions.

144. The misrepresentations made by Defendants, in fact, were false and known by Defendants to be false at the time the misrepresentations were made.

145. Defendants failed to exercise ordinary care in making their representations concerning Dupixent.

146. Plaintiff and Plaintiff's Prescribing Healthcare Providers reasonably relied upon the misrepresentations and omissions made by the Defendants.

147. Plaintiff and Plaintiff's Prescribing Healthcare Providers' reliance on the above-described misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

148. As a direct and proximate result of reliance upon Defendants' negligent misrepresentations and omissions, Plaintiff sustained serious bodily injury, severe pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, medical expenses and other economic losses, aggravation of previously existing conditions.

**FOURTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**

149. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleges as follows.

150. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting,

handling, storing, distributing, and/or promoting Dupixent, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

151. Defendants expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendants and/or their authorized agents or sales representatives, in publications, labeling, the internet, social media, brochures and other communications intended for physicians, patients, Plaintiff, and the general public, that Dupixent was safe, effective, fit and proper for its intended use.

152. As set forth above, Defendants warranted that Dupixent would "heal your skin from within," that it would allow patients to "du [sic] more," and that it would provide "benefits with every breath."

153. At the time Defendants manufactured, marketed, sold and/or distributed Dupixent, they knew that it was intended for human use, and that Plaintiff was a foreseeable user of the drug.

154. At the time of the making of the express warranties, Defendants had knowledge of the purpose for which Dupixent was to be used and warrantied the same to be in all respects safe, effective and proper for such purpose.

155. Dupixent materially failed to conform to those representations made by Defendants, in package inserts and otherwise, concerning the properties and effects of

Dupixent, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning the Dupixent sold to Plaintiff.

156. Defendants expressly warranted that Dupixent was safe and effective. However, Defendants did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Dupixent was dangerous to the well-being of Plaintiff and others.

157. Dupixent does not conform to those express representations because it is defective, is not safe, and has serious adverse side effects.

158. Plaintiff and Plaintiff's physicians justifiably relied on Defendants' representations regarding the safety and effectiveness of Dupixent, and Defendants' representations became part of the basis of the bargain.

159. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendants' representations that Dupixent was safe and effective in their decision to ultimately prescribe, purchase and use the drug.

160. Plaintiff's Prescribing Healthcare Providers justifiably relied on Defendants' representations through Defendants' marketing and sales representatives in deciding to prescribe Dupixent over other alternative treatments

on the market, and Plaintiff justifiably relied on Defendants' representations in deciding to purchase and use the drug.

161. Plaintiff's Prescribing Healthcare Providers prescribed, and Plaintiff used Dupixent for its intended purpose, and in a reasonable, foreseeable manner.

162. Plaintiff purchased and injected Dupixent without knowing that the drug is not safe or effective, but that Dupixent instead causes the development or acceleration of CTCL and PTCL.

163. The Dupixent manufactured and sold by Defendants did not conform to Defendants' express representations because the Dupixent caused serious injury Plaintiff when used as recommended and directed.

164. As a direct and proximate result of Defendants' breaches of express warranties, Plaintiff sustained serious bodily injury, severe pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, medical expenses and other economic losses, aggravation of previously existing conditions.

## **FIFTH CAUSE OF ACTION**
## **BREACH OF IMPLIED WARRANTY**

165. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleges as follows.

166. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Dupixent, and placed it into the

stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

167. Defendants were the sellers of Dupixent and sold Dupixent to be taken for treatment of atopic dermatitis. Plaintiff was prescribed and purchased Dupixent for this intended purpose.

168. When the Dupixent was prescribed by Plaintiff's Prescribing Healthcare Providers and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

169. Defendants impliedly warranted, through their marketing, advertising, distributors and sales representatives, that Dupixent was of merchantable quality, and fit for the ordinary purposes and uses for which it was sold.

170. In fact, Dupixent was not of merchantable quality nor fit for the ordinary purposes and uses for which it was sold and did not meet the expectations of consumers.

171. The Dupixent manufactured and supplied by Defendants was not of merchantable quality and was not fit for the ordinary and/or particular purpose for which it was intended as physicians and patients would expect the drug to not cause the development or acceleration of CTCL and PTCL.

172. Plaintiff and Plaintiff's Prescribing Healthcare Providers reasonably and justifiably relied upon the skill and judgment of Defendants as to whether Dupixent was of merchantable quality and safe for its intended and particular use and purpose.

173. Contrary to such implied warranties, Dupixent was not of merchantable quality or safe for its intended and particular use and purpose, because the drug causes the development or acceleration of CTCL and PTCL

174. Defendants' breach of their implied warranties resulted in Plaintiff being prescribed and using Dupixent, which placed Plaintiff 's health and safety at risk and resulted in the damages alleged herein.

175. As a direct and proximate result of Defendants' acts and omissions, including breach of implied warranties, Plaintiff was prescribed and injected with Dupixent and sustained serious bodily injury, severe pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, medical expenses and other economic losses, aggravation of previously existing condition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, and severally, as follows:

a. Judgment in favor of Plaintiff and against each Defendant, for damages in such amounts as may be proven at trial as determined by the jury in its discretion after hearing the evidence;

b. Compensation for past economic and non-economic losses, including but not limited to medical expenses, pain and suffering, loss of consortium, mental anguish and emotional distress, in such appropriate amounts as determined by the jury in its discretion after hearing the evidence at trial;

c. Attorneys' fees and costs;

d. Interest; and

e. Any and all further relief, both legal and equitable, that the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all counts and as to all issues.

Dated: March 4, 2026

Respectfully Submitted,

*/s/ Mitchell Theodore*

Mitchell Theodore (Bar Number: 103177)
Jon C. Conlin (to be admitted *pro hac vice)*
**CORY WATSON P.C.**
2131 Magnolia Avenue South
Birmingham, AL 35205
Phone: (205) 328-2200
Fax: (205) 324-7896
mtheodore@corywatson.com
jconlin@corywatson.com

*Attorneys for Plaintiff*